AG:AH

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA

     -against-

MAHMOOD HUSSAIN,
        also known as "Mo"
        and "Mohamed Hussain,"

        Defendant.
- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA

     -against-


THE PREMISES KNOWN AND
DESCRIBED AS 322 EAST 28TH
STREET, BROOKLYN, NEW YORK

- - - - - - - - - - - - - - -X
EASTERN DISTRICT OF NEW YORK, SS:

# M-10-750

AFFIDAVIT IN SUPPORT OF ARREST
WARRANT AND SEARCH WARRANT
(21 U.S.C. §§ 841(a) and 846)

       JEFFREY BOLETTIERI, being duly sworn, deposes and says that he is a Task Force Officer assigned to the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such.

     A.  Upon information and belief, there is probable cause to believe that, on or about and between November 2009 and July 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MAHMOOD HUSSAIN, also known as "Mohamed Hussain" and "Mo," together with others, did knowingly and intentionally conspire to distribute and to possess with intent to distribute cocaine, a Schedule II

1

controlled substance, in violation of Title 21 U.S.C. §
841(a)(1).

(Title 21, United States Code, Section 846).

B.   Upon information and belief, there is probable
cause to believe that there is located at THE PREMISES KNOWN AND
DESCRIBED AS 322 EAST 28TH STREET, BROOKLYN, NEW YORK ("HUSSAIN
RESIDENCE" or "SUBJECT PREMISES"): (1) narcotics; (2) United
States currency used to purchase narcotics or representing
proceeds from the sale of narcotics; (3) books, records, ledgers,
papers and other documents reflecting information such as names,
telephone numbers, addresses and financial records of individuals
involved in trafficking in narcotics or electronic forms thereof;
(4) books and records showing narcotics transactions, prices
and/or quantities of narcotics purchased and/or sold; (5) books
and records showing cash transactions or other evidence of
narcotics trafficking, including, but not limited to, financial
records, including money receipts, credit card receipts, bank
records showing deposit, withdrawals and/or payments made by
check or cash; (6) zip-lock bags, packaging materials, including
tape, scales, heat sealers and other materials used to package or
measure narcotics or count money; (7) chemicals or other
materials used to process narcotics; (8) cellular telephones,
pagers, telephone bills, pager bills and similar records; (9)
photographs of any of the defendants or any other known narcotics
associates; and (10) firearms, all of which constitute evidence,

2

fruits and instrumentalities of narcotics trafficking in violation of Title 21, United States Code, Sections 841(a) and 846.

The source of your deponent's information and the grounds for his belief are as follows[1]:

1.    I have been a Deputy Sheriff Investigator with the Suffolk County Sheriff's Office for approximately sixteen years and for approximately five years, have been cross-designated as a Task Force Officer with the Drug Enforcement Administration ("DEA") on Long Island.  In this position, I am tasked with investigating narcotics trafficking, money laundering and other offenses.  During my tenure with the DEA, I have participated in numerous narcotics investigations during the course of which I have: (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds and records of narcotics and money laundering transactions have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers and money launderers; (d) debriefed cooperating drug traffickers and money launderers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking and money

---

[1]    Because the purpose of this affidavit is merely to establish probable cause, I have not set forth all of the facts and circumstances of which I am aware.

laundering.  Through my training, education and experience, I
have become familiar with: (a) the manner in which illegal drugs
are imported and distributed; (b) the method of payment for such
drugs; and (c) the efforts of persons involved in such activity
to avoid detection by law enforcement, including money
laundering.

2.    Since November 2009, I, along with agents of the
DEA and Internal Revenue Service ("IRS"), have been involved in
the investigation of a cocaine distribution conspiracy involving
the defendant MAHMOOD HUSSAIN, also known as "Mohamed Hussain"
and "Mo."  The investigation has revealed that HUSSAIN, together
with others, imports kilogram quantities of cocaine from Jamaica
and Curacao for further distribution in the New York area.

3.    I have personally participated in this
investigation by, among other things, conferring with other law
enforcement agents involved in the investigation, conducting
surveillance, debriefing confidential sources, and reviewing
information provided to me by other agents, translators and
agents' reports.  I have also personally been involved in both
reviewing toll records and communications intercepted pursuant to
authorized wire taps of telephones used by participants in the
conspiracy to conduct narcotics trafficking and analyzing the
intercepted conversations and summaries of conversations.

4

4.    As set forth below, your deponent has summarized certain portions of recorded conversations that were intercepted during the court-authorized wire surveillance.  I have not summarized every pertinent intercepted call or all portions of the pertinent calls cited herein.  Moreover, the summaries are preliminary and often based on contemporaneous notes made by monitors of the wire surveillance and not on verbatim transcripts.  All conversations set forth below are summarized in part and in substance only.[2]  The conversations summarized herein are not intended to be verbatim accounts of intercepted communications.

5.    Throughout this affidavit, my beliefs are expressly stated.  These beliefs constitute the opinion of your deponent, based on: my experience and training in investigating narcotics and firearm trafficking; my review of intercepted communications, including other communications not summarized in this affidavit; information gathered from confidential sources and fellow agents; and my overall knowledge of and involvement in this case, as set forth in more detail above.

_____

[2]    The contents of wire interceptions set forth in this affidavit are disclosed pursuant to Title 18, United States Code, Section 2517(2), which permits such disclosure whenever "appropriate to the performance of [my] official duties." Moreover, this affidavit will be disclosed to counsel for the defendants, and thus also serves as notice, pursuant to Title 18, United States Code, Section 2518(9), that the interceptions described herein, as well as other interceptions from the electronic surveillance, may be used at detention hearings regarding the defendants.

6.    The facts set forth in this affidavit are based on personal knowledge and observations, discussions with and information provided by confidential informants and witnesses, surveillance, review of the case file, and conversations with other law enforcement officers working with me on this investigation.

## Background and Information from CW#1

7.    During the course of this investigation, agents have learned that HUSSAIN, together with others, imports kilogram quantities of cocaine from Jamaica and Curacao for further distribution in the New York area.

8.    The investigation has further revealed that HUSSAIN uses his residence, located at 322 East 28th Street, Brooklyn, New York, as a base of operations to conduct narcotics trafficking.  Given the extensive nature of his narcotics trafficking, it is likely that HUSSAIN also maintains records, including financial records, related to his illegal activities.

9.    CW#1 is a cooperating witness intimately familiar with narcotics trafficking in Brooklyn, who has provided information to the DEA over the course of approximately the past nine months.  CW#1 is willing to testify and CW#1's information is corroborated by, among other things, consensual recordings,

consensually-monitored calls, independent documentary evidence, and interceptions of communications via the wiretaps.[3]

10.   CW#1 advised agents of the existence of a drug trafficking organization ("DTO") operating between the five boroughs of New York, Long Island, Curaçao and Jamaica (the "DTO").  The DTO is a cocaine trafficking organization actively transporting kilogram quantities of cocaine from Curaçao and Jamaica to New York.  CW#1 advised, in sum and substance, that HUSSAIN is a principal of the organization and that the DTO is responsible for importing and distributing six to twelve kilograms of cocaine per week through a sophisticated network of couriers.  The DTO utilizes female couriers to transport USC from New York and Florida to the source of supply ("SOS") in Jamaica and Curaçao via commercial airlines.  The DTO pays approximately $14,000 USC per kilogram of cocaine including transportation fees.  Once the kilograms are purchased, they are either compressed and sewn into luggage and handbags which are transported back to New York by the couriers via commercial airlines, or swallowers ingest pre-made pellets prior to boarding

---

[3]     The description herein of CW#1's information is based on reporting from the DEA of debriefings of CW#1 and review of conversations consensually recorded by CW#1.  CW#1 has had prior convictions for attempted robbery, petit larceny, narcotics distribution, firearms possession and criminal trespass.  After the DEA arrested CW#1 for a cocaine distribution conspiracy, CW#1 pled guilty pursuant to a cooperation agreement to conspiracy to distribute cocaine, money laundering conspiracy and unlawful possession of a firearm.  CW#1 is cooperating in the hope of obtaining leniency at sentencing.

flights to the United States.  Once the cocaine arrives in New York, the kilograms are then distributed and sold for approximately $34,000 USC each.

11.  On December 8, 2009, the DEA conducted an undercover purchase of an illegal firearm, specifically, a .45 caliber handgun, by CW#1 from HUSSAIN.  In furtherance of this purchase, at approximately 2:48 p.m. on December 8, 2009, CW#1 placed an outgoing, recorded call to HUSSAIN in the presence of agents.  The following conversation took place, in sum and substance:

|  |  |
|---|---|
| CW#1: | HELLO. YO. |
| HUSSAIN: | HEY, YOU OUTSIDE? |
| CW#1: | NO, I'M IN THE CITY RIGHT NOW MAN. |
| HUSSAIN: | OH OKAY. |
| CW#1: | BUT UM. HEY I NEED THAT JOHN [GUN] FROM YOU REAL QUICK. |
| HUSSAIN: | OKAY. |
| CW#1: | ARE YOU AROUND? |
| HUSSAIN: | I'M HOME |
| CW#1: | OH, YOU HOME! |
| HUSSAIN: | YEAH. |
| CW#1: | OKAY I'M HEADED THAT WAY RIGHT NOW MAN. |
| HUSSAIN: | ALRIGHT GIVE ME A CALL I'LL BE HOME. |
| CW#1: | ALRIGHT COOL. |

12.  On that same date at approximately 2:55 p.m., the CW#1 placed a second call to HUSSAIN after learning that HUSSAIN placed the handgun inside the CW#1's garbage can.  This call was also recorded and placed in the presence of agents.  The following conversation took place, in sum and substance:

CW#1:     YO, SON I DON'T KNOW WHY THE HELL YOU DID THAT.  DO ME A FAVOR, I'M GONNA BE THERE IN 5 MINUTES, TAKE THAT OUT OF THE GARBAGE CAN AND MEET ME AT THE CORNER OF AVENUE D AND OUR BLOCK MAN.

HUSSAIN:  WHY?

CW#1:     CAUSE I'M GONNA KEEP MOVING THAT'S WHY.  OH MY GOD.  JUST HEAR, SON!  JUST MEET ME ON THE CORNER I'M IN MY CAR.

HUSSAIN:  OH MAN YOU WANT ME TO GO PICK IT UP?

CW#1:     YEAH.  WHAT THE HELL YOU DO THAT FOR?  MY TENANTS COULD COME DOWNSTAIRS [CROSSTALK].  DAVE BE FUCKIN' WITH MY GARBAGE CAN, MAN.  THAT'S NOT GOOD.

HUSSAIN:  NO DID THAT SHIT INCONSPICUOUS MAN, I DON'T WANT TO MAKE IT LOOK LIKE . . .

CW#1:     THERE'S A BUNCH OF TRASH IN MY YARD, MAN.  JUST GO BACK ACROSS THE STREET GRAB THAT SHIT AND MEET ME ON THE CORNER.

HUSSAIN:  YOU WANT ME TO WALK WITH THAT?

CW#1:     YOU GOT A CAR, DRIVE DOWN THE ROAD.  I'LL MEET YOU IN FRONT OF YOUR HOUSE THEN.

HUSSAIN:  ALRIGHT, MAN.

CW#1:     AT LEAST DO IT IN A CAR, WHAT'S WRONG WITH YOU?

HUSSAIN:  I JUST LEFT IT THERE FOR YOU, MAN.  I THOUGHT I WAS DOING YOU A FAVOR.

9

CW#1:       IT'S A SCARY FEELING WHEN I GOT TENANTS
            AND SHIT, AND DAVE PUTTING TRASH DOWN
            THERE.

HUSSAIN:    OH SHIT I GOTTA GO OUT THERE MAN,
            EVERYBODY IS OUTSIDE NOW, FUCK!

CW#1:       WHO IS OUTSIDE?

HUSSAIN:    ERIC AND THEM, THAT SHIT'S STILL RIGHT
            THERE. I PUT IT IN A BOX AND EVERYTHING.
            THAT SHIT'S IN A GARBAGE BAG.

CW#1:       JUST WALK ACROSS THE STREET, NOBODY
            GONNA PAY YOU NO MIND, MAN.

HUSSAIN:    THEY LOOKING AT ME RIGHT NOW.  THEY'RE
            ALL LOOKING AT ME LIKE.  I TELL YOU IT'S
            WRAPPED UP IN A BOX MAN, IT'S BETTER IF
            YOU GO TAKE IT OUT MAN, TRUST ME ON THAT
            I DID IT RIGHT.  I WOULDN'T DO ANYTHING
            STUPID. IF YOU WANT ME TO GO BACK THERE
            IT'S GOING TO LOOK OBVIOUS BUT I'LL DO
            IT IF YOU WANT ME TO.

CW#1:       YEAH, SON, THAT'S NOT GOOD.

HUSSAIN:    I'M OUTSIDE.  I DON'T SEE YOU.

CW#1:       I'M ON CORTELYOU AND CONEY ISLAND
            AVENUE.

HUSSAIN:    YOU'RE NOT EVEN CLOSE, MAN.

CW#1:       IT IS CLOSE, THAT'S WHAT I'M SAYING.
            THAT'S WHY I DIDN'T WANT YOU TO LEAVE IT
            THERE.

HUSSAIN:    I'M GONNA STAY HERE AND WATCH IT, IT'S
            IN A BOX AND EVERYTHING.  YOU WANT ME TO
            TAKE IT OUT, I'LL TAKE IT OUT.

CW#1:       PLEASE.

HUSSAIN:    IT'S GOING TO LOOK OBVIOUS BUT . . .
            ALRIGHT I PICKED IT UP ALREADY.

CW#1:       YOU GOT IT?  I'M COMING DOWN CORTELYOU
            RIGHT NOW.  JUST JUMP IN THE CAR WITH
            ME.

HUSSAIN:   I AIN'T JUMPING IN NO CAR, MAN.

CW#1:      WHERE YOU WANT TO MEET ME?

HUSSAIN:   IN FRONT OF MY HOUSE.

CW#1:      I'M COMING, MAN.

13.   Following this call, at approximately 3:57 p.m., agents who were stationed outside the HUSSAIN RESIDENCE observed CW#1 arrive in a car and park in front of the HUSSAIN RESIDENCE. Agents then observed HUSSAIN exit the HUSSAIN residence carrying a black-colored plastic bag.   Agents then watched HUSSAIN hand the black-colored plastic bag to CW#1.   Agents thereafter recovered the black-colored plastic bag from CW#1 and found therein a Rugar handgun and matching magazine concealed in a box.

### May 23, 2010 Seizure of
### Approximately 2.25 Kilograms of Cocaine

14.   In a series of intercepted telephone calls occurring on and between May 11 and May 18, 2010, HUSSAIN discussed arrangements to send two female couriers to Jamaica for the purpose of bringing cocaine into the United States.   Among other things, during intercepted conversations, HUSSAIN discussed his efforts to have two couriers travel together to Jamaica, when the couriers could leave the New York area for Jamaica, how much the plane tickets for the couriers cost, and how much money he and other co-conspirators would make from the venture.   During intercepted telephone calls, HUSSAIN also discussed whether or

not the source of supply ("SOS") in Jamaica was willing to provide the cocaine transported by the couriers on consignment.

15.   Pursuant to the calls detailed in the preceding paragraph of this Affidavit, along with other calls placed and received to several other targets, agents were able to identify the two couriers (Courier 1 and Courier 2) who were sent to Jamaica to pick up cocaine on behalf of the DTO.  On the evening of May 23, 2010, Courier 1 and Courier 2 arrived at John F. Kennedy International ("JFK") Airport in Queens, New York, aboard JetBlue flight No. 780 from Montego Bay, Jamaica.  After they disembarked the plane, Courier 1 and Courier 2 were stopped by Customs and Border Protection ("CBP") officers and found to be in possession of approximately 2.25 kilograms of cocaine.

16.   In intercepted conversations the evening of May 23, 2010, after the scheduled arrival of Couriers 1 and 2 from Jamaica into JFK, HUSSAIN expressed his anxiety regarding the status of the couriers and the fact that the couriers did not come out of the airport as expected.

### June 2, 2010 Transaction

17.   A series of intercepted calls on June 2, 2010 revealed that HUSSAIN, together with others, arranged to sell one kilogram of cocaine to an unindicted co-conspirator ("CC-1") and to have another unindicted co-conspirator ("CC-2") deliver the cocaine to CC-1.  Specifically, during intercepted conversations on June 2, 2010, HUSSAIN discussed both whether CC-2 was

12

available to bring the cocaine to him and how long it would take CC-2 to make the delivery.  In additional intercepted conversations, CC-2 independently confirmed that he was able to make the delivery.

18.  Also on June 2, 2010, agents observed a brown colored 2006 Ford Explorer ("Ford Explorer") operated by CC-2. Agents then observed HUSSAIN reach into the front passenger's side window of the Ford Explorer and retrieve a light blue plastic bag ("Blue Bag").  After retrieving the Blue Bag, agents observed HUSSAIN walk into the HUSSAIN RESIDENCE.  Approximately 35 minutes later, agents observed a blue-colored BMW ("BMW") arrive and park in front of the HUSSAIN RESIDENCE.  Agents then observed CC-1, empty handed, exit the BMW and enter the HUSSAIN RESIDENCE.  A few minutes later, at approximately 6:45 p.m., agents observed CC-1 exit the HUSSAIN RESIDENCE, stand in a front yard, and then exit the front yard carrying the Blue Bag.  CC-1 then got into the BMW and departed the area.

19.  On the next day, June 3, 2010, during an intercepted conversation, CC-1 discussed his desire to return the cocaine that he had obtained because he believed that the cocaine was of poor quality.  Specifically, in an intercepted conversation, CC-1 complained that the cocaine was brownish in color and was only 39% pure.

**The SUBJECT PREMISES**

**HUSSAIN RESIDENCE**

20.   Based on my observations and other sources of information detailed herein, the HUSSAIN RESIDENCE is located at 322 East 28th Street, Brooklyn, New York, and is a two-story frame dwelling with white vinyl siding and a brown-colored door. The front door is also secured by a black wrought-iron security gate.  The HUSSAIN RESIDENCE is situated on the west side of East 28th street facing an easterly direction.

21.   Both New York State Department of Motor Vehicles records and Consolidated Edison records indicate that HUSSAIN resides at 322 East 28th Street, Brookly, New York.

**Probable Cause to Search the HUSSAIN RESIDENCE**

22.   There is probable cause to believe that HUSSAIN uses the HUSSAIN RESIDENCE to receive and store narcotics, narcotics related paraphenalia, narcotics proceeds, and records relating to narcotics trafficking, including, but not limited to books, records, ledgers, papers and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and records showing narcotics transactions, prices and/or quantities of narcotics purchased and/or sold, zip-lock bags, packaging materials, including tape, scales, heat sealers and other materials used to package or measure narcotics

or count money and cellular telephones, telephone bills and similar records.

23.   As set forth above, agents have intercepted numerous telephone conversations between HUSSAIN and other defendants in which they discuss their drug trafficking activities.   Several of these calls, which are described in detail above, indicate that HUSSAIN uses the HUSSAIN RESIDENCE as a base for his drug trafficking operations.   Specifically, as set forth in detail above, upon information and belief, on June 2, 2010 agents observed HUSSAIN receive a cocaine delivery in a Blue Bag from CC-2 at the HUSSAIN RESIDENCE.   Later that day, agents observed CC-1 arrive at the HUSSAIN RESIDENCE, enter the HUSSAIN RESIDENCE and then emerge carrying the Blue Bag before departing in his car.

24.   Based on my training and experience and information obtained during the course of this investigation, I have learned that drug traffickers often keep their drugs, drug ledgers, cash, financial records and the other items described in paragraph B above in areas over which they have exclusive control, such as their homes.   For these reasons and based on the evidence outlined above, there is probable cause to search the HUSSAIN RESIDENCE for the items described in paragraph B above, including records of HUSSAIN's involvement in drug trafficking and evidence regarding the identities of his co-conspirators.

15

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for defendant MAHMOOD HUSSAIN, also known as "Mohamed Hussain" and "Mo," so that he may be dealt with according to law.

WHEREFORE, your deponent further respectfully requests that a search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS 322 EAST 28th STREET, BROOKLYN, NEW YORK ("HUSSAIN RESIDENCE" or "SUBJECT PREMISES") authorizing your deponent or any other law enforcement agents working for or with the DEA to search for and seize the items described in paragraphs B, all of which constitute evidence, fruits and instrumentalities of narcotics trafficking in violation of Title 21, United States Code, Sections 841(a) and 846.

Based on the nature of this application, I respectfully request that this affidavit and the accompanying arrest and search warrants be issued under seal until further order of this

16

Court to prevent the destruction and/or concealment of evidence and/or the flight of targets.

Dated:      Brooklyn, New York
            6/30          , 2010

                                        JEFFREY BOLETTIERI
                                        Task Force Officer
                                        Drug Enforcement Administration

Sworn to before me on this
30   day of   June   2010.

UNITED S                         DGE
EASTERN                           K

            S/Bloom

17